Oldershaw v. Knoles.

## PERCIVAL P. OLDERSHAW ET AL.

### v.

### STEPHEN S. KNOLES.

1.  CONTRACTS—USAGE OF TRADE —Where a contract is entered into. the parties are presumed to deal with reference to the known general or uniform custom or usage governing the business or subject-matter to which the contract relates, unless they exclude such presumption by the terms of the agreement itself.

2.  PROOF OF USAGE.—A custom or usage may be proved to interpret the otherwise indeterminate intention of the parties, and to ascertain the nature and extent of their contracts, not from their express stipulations, but from mere implication and presumption, and acts of doubtful or equivocal character; but to have commercial usage take the place of general law, it must be so uniformly acquiesced in for such a length of time, that a jury will feel warranted in finding that such usage entered into the minds of the parties, and formed a part of their contract.

3.  CUSTOM AT PARTICULAR MARKETS.—A person dealing at a particular market will be taken to deal according to the known general and uniform custom of that market, and if he employs another to act for him at such market, he will be taken as intending that the business will be done according to the usage or custom of that market, whether the principal in fact knew of such custom or usage, or not.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.   Opinion filed May 2, 1879.

Messrs. DENT & BLACK, for appellants; contending that contracts like the one in question are enforcible, cited Wolcott v. Heath, 78 Ill. 433; Corbett v. Underwood, 83 Ill. 324; Pixley v. Boynton, 79 Ill. 351; Logan v. Musick, 81 Ill. 415.

Where a party orders a broker to make purchases for future delivery on the Board of Trade, and fails to put up margins, the broker may close out the contract, and recover the difference from his principal: Corbett v. Underwood, 83 Ill. 324; Mœller v. McLagan, 60 Ill. 317; White v. Smith, 54 N. Y. 522; Kingsbury v. Kirwan, 6 Cent. Law Jour. 228.

Usages of trade are presumed to enter into all contracts where such usage prevails: Doane v. Dunham, 79 Ill. 131; Lyon v. Culbertson, 83 Ill. 33; Home Ins. Co. v. Favorite, 46

Ill. 263; Kingsbury v. Kirwan, 6 Cent. Law Jour. 228; Lonergan v. Stewart, 55 Ill. 44.

As to the right of the broker to make exchanges, as in this case: Horton v. Morgan, 19 N. Y. 170; Bailey v. Bensley, 10 Chicago Legal News, 220; Price v. Gover, 40 Md. 102; Worthington v. Townery, 34 Md. 193; Nourse v. Prime, 4 Johns. Ch. 490; Stewart v. Drake, 46 N. Y. 449.

Mr. A. B. Jenks, for appellee: argued that this was a gambling contract, and cited Pickering v. Cease, 79 Ill. 328; Lyon v. Culbertson, 83 Ill. 33.

A broker appointed for a special transaction can only bind his principal as to such transaction: Wharton on Agency, § 712.

An agent cannot deal for his own advantage with the goods of his principal: Tewksberry v. Spruance, 75 Ill. 187; Story on Agency, § 333; Wharton on Agency, § 717; Taussig v. Hart, 58 N. Y. 425; McDonald v. Fithian, 1 Gilm. 269; Fairman v. Bavin, 29 Ill. 75; Hughes v. Washington, 72 Ill. 84.

To bind the principal he must be fully informed of all the facts of the transaction: Cadwell v. Meek, 17 Ill. 220; Farwell v. Meyer, 35 Ill. 40.

A principal is not bound by acts not within the scope of the agent's authority: Mathews v. Hamilton, 23 Ill. 470.

As to the admission of evidence of usage: Corbett v. Underwood, 83 Ill. 324; Turner v. Dawson, 50 Ill. 85; Bissell v. Ryan, 23 Ill. 566; Wilson v. Bauman, 80 Ill. 493.

Bailey, J. The only questions to be considered in this case arise upon the refusal of the court below to admit certain evidence offered on behalf of the appellants. The suit was brought by the appellants to recover of the appellee a sum due them as commissions, and also certain payments of money which they claim to have made for appellee in settling and closing up certain grain transactions on the Board of Trade of Chicago, entered into by them at the instance, and on behalf of appellee.

At the time in question the appellants were commission

merchants in Chicago, engaged, among other things, in the business of purchasing and selling on the Board of Trade, for such persons as saw fit to employ them, grain and provisions for future delivery. The appellee, at the same time, was a resident of Jacksonville, Ills. The evidence shows that on the 13th day of February, 1877, appellee, having previously employed appellants in one or more transactions of like character, telegraphed them from Jacksonville, authorizing and requesting them, in case "April lard"—that is, lard deliverable on such day in the month of April following as might afterwards be determined upon by the seller—could be purchased at a price specified, to buy for him two hundred and fifty tierces. In compliance with this order, appellants, on the same day, purchased, in the usual course of business on the Board of Trade, in their own names, but for the benefit of appellee, at a price slightly below that mentioned by appellee in his despatch, the amount of April lard requested. On the day following, appellee, in like manner, telegraphed them to make a further purchase for him of two hundred and fifty tierces of April lard, naming the maximum price to be paid. This commission was also in like manner executed by appellants, at a price within the maximum named. On the next day, February 15th, appellee again telegraphed appellants, requesting them to purchase for him five hundred tierces more of April lard, at a price named, which purchase was also made on the same day, at a fraction below said price. Of these purchases, the first was made from Messrs. Alvord & Co.; the second from J. B. Campbell; and the third, one-half from Alexander Geddes, and the other half from Messrs. Armour & Co. At the time of making the last order, appellee remitted to appellants the sum of $700, to be used by them as margins on his purchases. Notice was given to appellee, by telegraph, of these several purchases, and the price agreed to be paid, as soon as the same were made.

During the days these purchases were being made the price of lard was gradually declining, and continued thereafter to decline with considerable rapidity, so as to render the $700 advanced by appellee wholly inadequate as a margin upon

said purchases under the rules of the Board of Trade. Under these circumstances appellants demanded of appellee an additional margin, and appellee failing to comply with such demand, appellants, on the 21st day of February, as they testify, sold out the thousand tierces of lard in the market on the Board of Trade, in the ordinary course of business, at the then market price of April lard. This sale resulted in a net loss upon the thousand tierces of lard of $2,400, besides appellants' commissions, which amounted to $158.10. Deducting from the amount of these two sums the $700 advanced by appellee, leaves him, as appellants claim, in their debt in the sum of $1,858.10.

The evidence upon the trial, however, showed that after these several purchases were made by appellants for appellee, appellants, at least as to 750 tierces of said lard, settled said purchases with the parties from whom the same were made, prior to the sale on the 21st of February, realizing a profit therefrom, and that shortly after said sale they, in like manner, settled the purchase of the remaining 250 tierces with the party from whom that purchase was made, and in so doing suffered a loss of only $540. These settlements appear to have been made substantially in the following manner:

On the 30th of January, 1877, appellants had sold to Alvord. & Co. for N. K. Fairbank & Co., customers of theirs, 250 tierces of April lard. On making the purchase from Alvord & Co. for appellee of 250 tierces of April lard, appellants and Alvord & Co. agreed upon a settlement as between themselves, offsetting the one purchase against the other, appellants collecting a small difference in their favor, and eventually accounting to N. K. Fairbank & Co. therefor. Prior to the purchase of the 250 tierces from Campbell, appellants, acting for another party, had sold the same amount of April lard to Maynard & Kelly. Finding that Maynard & Kelly had sold the same amount to Campbell, the three parties interested, as between themselves, agreed upon and effected a settlement of the transaction. Prior to the purchase for appellee of the 250 tierces from Geddes, appellants sold 250 tierces of April lard for another customer to Milward & Co. Milward & Co. had

Oldershaw v. Knoles.

sold the same amount to Washington Butcher's Sons, and the latter firm had the same amount sold to Geddes. This condition of mutual dealings being ascertained, a settlement was effected by the four parties interested. The purchase for appellee from Armour & Co. was settled with Armour & Co. directly after appellee's lard had been sold out.

The foregoing facts appearing in evidence, appellants offered to prove by the testimony of the appellants themselves, that as to the said purchases of lard made on behalf of appellee, the three settlements made prior to February 21st were effected in the following way, and not otherwise: that after making said purchases in the ordinary course of business upon the Board of Trade, it was found that appellants had sales made on account of other parties, customers of appellants who were entirely responsible, for corresponding amounts of lard of the same delivery to the extent of 750 tierces; that such sales were made to said customers of appellants, either directly to the same parties from whom the purchases were made for appellee, or to some other person or persons who had sold lard to the parties from whom it had been purchased by appellants for appellee; that finding out this condition of facts after said purchases had been made on account of appellee, appellants, in accordance with the general custom and usage obtaining in such matters upon the Board of Trade, made the settlements as to the 750 tierces of lard with the parties from whom they had it purchased; that by such settlements appellants obtained no interest whatever in the lard bought for appellee, but that the effect of such settlements in each case was merely to discharge the party from whom the lard had been purchased for appellee, by substituting in his stead another entirely responsible person for whose account appellants had the lard sold, leaving appellants responsible to such new party to carry out the contract of purchase, and making such new party liable to appellee, in all respects, to deliver the lard through appellants to him as the party from whom appellants had originally bought the lard for appellee; that in all these cases, as in all business dealings of this character, appellants guaranteed all the transactions, both the purchases for the account of appellee, and the sales for the

account of the other parties for whom such lard was sold; also that appellee was familiar with said customs and usages of the Board of Trade at the time of his dealings with appellants.

In connection with the foregoing, appellants further offered to prove by the testimony of the appellants and certain other witnesses named, that it is the general custom of commission merchants upon the Board of Trade to guarantee all purchases and sales made by them, not disclosing the names of their principals, nor giving to their principals the names of the parties from whom they have purchased, or to whom they have sold; that it is, and for a long time prior to making the settlements in question, had been the general custom and usage upon the Board of Trade, to make settlements between the commission merchants upon mutual consent and for their mutual convenience, of the character described by the witnesses, in such cases as that at bar, where it is found that purchases and sales have been made of and to the same party directly or indirectly; that by such settlement the commission merchant substituted for his customer the responsibility of a party for whom he had previously made the sale for that of the party from whom he had made the purchase, and that such substitution was in accordance with the uniform custom and usage of dealers on the Board of Trade in such cases.

Appellants further offered to show by all of said witnesses, that they were members of said Board of Trade, and were such on and prior to February, 1877, and were acquainted with its customs, usages, rules and regulations; that by the universal custom in business on said board, where a commission merchant has bought for a customer, provisions or other merchandise, deliverable in the future, or has sold for such customer, merchandise deliverable in the future, and by reason of the default of such customer or upon his order, the commission merchant closes out the contracts of such customer, such closing out is made by going upon the Board of Trade, and there buying or selling for the account of such customer, upon such order or by reason of such default, the corresponding amount of merchandise which has before been purchased or sold for such customer; that the commission merchant never takes the

Oldershaw v. Knoles.

identical contract that was made for such customer and offers
that contract for sale, but simply closes the transaction upon
the market in the manner above described.

The testimony thus offered, and each and every portion
thereof was excluded by the court, to which ruling appellants
duly excepted.    The cause being tried before the court with-
out a jury, the issues were thereupon found for appellee, and
judgment rendered against appellants for costs.

The subject matter of these several offers of appellants
would seem in some respects, to consist of conclusions of law,
rather than facts.    But apart from this single objection, we
are unable to perceive any valid reason why the testimony
offered should not have been received.

The principal question here raised, relates to the admissibil-
ity in evidence of the custom and usages of business on the
Board of Trade, where the dealings in question took place. The
rule seems to be general that when a contract is entered into,
the parties are presumed to deal with reference to the known,
general or uniform custom or usage governing the business or
subject matter to which it relates, unless they rebut such pre-
sumption by the terms of the agreement itself.    Home Ins.
Co. v. Favorite et al. 46 Ill .263;  Doane et al. v. Dunham, 79
Ill. 131;  Bailey v. Bensley, 87 Ill. 556.    "Although it is true
usages of trade cannot be set up either to contravene an es-
tablished rule of law or to vary the terms of an express con-
tract, yet all contracts made in the ordinary course of business
without particular stipulations, expressed or implied, are pre-
sumed to be made in reference to any existing usage or custom
relating to such trade, and it is always competent for a party
to resort to such usage to ascertain and fix the terms of the
contract."    Lonergan v. Stewart, 55 Ill. 44.

A very full and satisfactory discussion of the principle here
involved is found in Lyon et al. v. Culbertson et al., 83 Ill. 33,
where the Supreme Court uses the following language: "Inas-
much as the great mass of commercial business is transacted
by men pressed by their affairs, and who are not in the habit,
even if time would permit, of reducing their agreements to
writing beyond a mere memorandum, the courts are compelled

to look to the usages of trade or business to learn the real intention of the parties. If proof of such usages was not allowed, it is believed that in a large number, if not the greater portion, of commercial transactions, the intention of the parties would be defeated instead of being enforced, when differences should occur between them. Where there is a well-known usage which obtains in trade, it must be presumed that all who are engaged in that business where it prevails, contract with a view to it, unless they exclude the presumption by their contract. Hence it has been repeatedly held by this court that a usage may be proved to interpret the otherwise indeterminate intention of the parties, and to ascertain the nature and extent of their contracts, not from their express stipulations, but from mere implication and presumptions and acts of doubtful or equivocal character; but to have commercial usage take the place of general law, it must be so uniformly acquiesced in for such a length of time that the jury will feel themselves constrained to find that it entered into the minds of the parties and formed a part of the contract."

The foregoing remarks are, in our opinion, peculiarly applicable to the present case. The number, magnitude and complexity of the transactions carried on by dealers on the Board of Trade, have necessitated the adoption of various customs, rules and usages for the regulation and government of the business of the board. Indeed, few of these transactions can be adequately understood from the words, either oral or written, actually employed by the contracting parties, without reference to the usages and rules of the trade. The language of the parties, standing alone, is often meaningless and incapable of interpretation, but when viewed in the light of these customs, rules and usages, it becomes plain, sensible and easily understood. In point of fact, the main body of these contracts is made up from the rules and usages of the board. Evidence, then, of these rules and usages must ordinarily, at least, form an indispensable element in the interpretation of these transactions.

In the present case, the only language employed between the parties was that contained in the brief and elliptical words of telegraphic despatches. The precise language of the despatch

Oldershaw v. Knoles.

in pursuance of which the purchase of February 13th was made, is as follows: " If April lard ten ninety buy two fifty." The other despatches were similar in form. The terms and character of the purchase, except as to quantity, price and month of delivery, were left wholly uncertain. The appellants being dealers on the Board of Trade, and being employed as such by appellee to make the desired purchase, it cannot be doubted that it was the intention of appellee to employ them to make these purchases for him on the Board of Trade in the manner in which business was usually transacted there, and subject to the customs, rules and usages there prevailing. Thus the Supreme Court, in Bailey v. Bensley, *supra*, say: " A person who deals in a particular market must be taken to deal according to the known general and uniform custom or usage of that market; and he who employs another to act for him at a particular place or market, must be taken as intending that the business to be done will be done according to the usage and custom of that place or market, whether the principal, in fact, knew of the usage or custom, or not."

The principal purpose for which appellants sought to introduce evidence of the usages and rules of the Board of Trade in this case, was to show that in these transactions appellee did not obtain a specific and absolute right to the particular contracts made by them in the first instance, but that they had for the purpose of closing out and getting off their books all deals where they happened to find themselves, either mediately or immediately, holding the position of both buyers and sellers of the same commodity, the right to substitute another responsible seller in the place of the one from whom the purchase was originally made. It should be remembered that these purchases were made by appellants in their own name, they becoming personally and individually responsible to the sellers for the payment of the purchase money when the property purchased should be delivered under the contract. It would certainly be highly prejudicial to the interests of this class of dealers to compel them, unnecessarily, to remain under this burden of liability in cases where by setting off such liability against a similar liability to them of the parties with whom

Oldershaw v. Knoles.

they dealt, both might be discharged. Unless the interests of the customer for whom the purchase was made were likely to be imperiled or injuriously affected in some way, we are unable to perceive any valid reason against permitting such settlement to be made.

If the evidence offered had been admitted, it would have appeared that by a general and uniform custom upon the Board of Trade, settlements of this character were made, and another responsible seller of the same commodity substituted for the one originally furnished to the customer. It must be deemed that this custom was within the meaning and intention of appellants and appellee; that appellee had it in view when he employed appellants to make such purchases for him, and that it entered into and formed a part of the contract between the parties.

The exceptions to the rule authorizing the admission of evidence of custom or usages of trade, are where such custom would vary the terms of an express contract, or contravene an established rule of law. As we have already seen, there was in this case no express contract between the parties, any of the terms of which were repugnant to the custom and usages sought to be proved. Nor are we able to perceive that such custom is in contravention of any established rule of law. It would have been entirely competent for these parties, by *express* agreement, to have provided for a substitution by the appellants of one vendor for another, precisely as was sought to be done in this case. Appellee might have expressly authorized appellant to buy for him the lard in question of one party, and to subsequently exchange such contract for that of any other responsible party they might select, provided only that some contract of a responsible seller in appellee's favor should all the time be kept open so as to secure the delivery of the lard at the time agreed upon. No rule of law would be contravened by such express contract, and precisely the same may be said of a contract to be implied from the circumstances and the usages of trade. If such provision would be valid in an express contract, it would be equally so in an implied contract. The two species of contracts are equally void, and for the same reason, where they are in violation of express rules of law.

Oldershaw v. Knoles.

It is urged that by virtue of the custom of which appellants seek to avail themselves, they became personally interested in the business of their principals, and thus assumed a position adverse to those for whom they were employed to act. This objection, we think, grows out of a misconception of the nature of the evidence offered. It should be observed that appellants were engaged in a general business as commission merchants. In such business they were acting not merely for appellee, but doubtless for many other customers as well. The profits derived from the various settlements made by them under the rules of the Board of Trade belonged, not to themselves, but to their customers. A substitution for a purchase made of a third party of a like commodity previously or subsequently sold for another customer, rendering such other customer an account of the differences received or paid on settlement of the original deal, would not, we think, involve the commission merchants in any interest in the business adverse to their principal. It is true, in all these transactions, they had an interest as nominal principals, and as actual guarantors to those for whom they dealt. Such interest, however, we think, was not obnoxious to the principle of law sought to be invoked. By these settlements they relieved themselves from personal liability upon the contracts settled and canceled. To this extent only were their individual interests affected. By the very terms of the offer appellants undertook to show that by these settlements they obtained no interest whatever in the lard bought for appellee, but that the effect of such settlements was merely, in each case, to discharge the party from whom the lard had been purchased for appellee, by substituting in his stead another responsible vendor, for whose account appellants had already made an equivalent sale of lard, leaving appellants responsible to such new party to carry out the contract of purchase, and making such new party liable in all respects to deliver such lard to appellee, through appellants, in the place of the party from whom appellants had originally made the purchase for appellee.

We think the court below erred in refusing to admit the evidence offered. For such error the judgment must be reversed.

Judgment reversed.